# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3058 | **DATE** | Jan. 29, 2002 |
| **CASE TITLE** | United States of America, ex rel Timothy T. Hampton  v  Roberta Fews | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

order GRANTING petition for writ of habeas corpus

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]

Memorandum opinion and order entered. Accordingly, petitioner's petition for a writ or habeas corpus is granted. Petitioner is to be released from custody unless the State of Illinois retries him within 90 days.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| X | Notices mailed by judge's staff. | | JAN 3 0 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | 27 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 02 JAN 29 PM 1:33 | date mailed notice | |
| GDS | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. TIMOTHY T. HAMPTON, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) ) | No. 00 C 3058 Judge Robert W. Gettleman |
| ROBERTA FEWS, | ) ) | |
| Respondent. | ) ) | |

DOCKETED
JAN 3 0 2002

## MEMORANDUM OPINION AND ORDER

Timothy T. Hampton is an Illinois state prisoner who was found guilty by a jury of possession of a controlled substance, possession of a controlled substance with intent to deliver, armed violence, and official misconduct in January 1998. Hampton's armed violence conviction was vacated and his official misconduct conviction was reversed by the Illinois Appellate Court in 1999, leaving his two possession convictions. See People v. Hampton, 718 N.E.2d 591 (Ill. App. Ct. 1st Dist. 1999) ("Hampton"). Hampton filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this court on May 17, 2000. Hampton's petition raised several arguments, most notably a claim that he was not afforded an "opportunity for full and fair litigation" of his Fourth Amendment search and seizure claim by the Illinois trial or appellate courts. See Stone v. Powell, 428 U.S. 465 (1976). The court appointed counsel and gave both parties time to file additional briefs. Having now carefully considered the arguments of both parties, the court grants the petition for a writ of habeas corpus.

27

# FACTS[1]

The relevant events in this case occurred on March 8, 1998. At 10:40 p.m. that day Maywood, Illinois police officer James Robinson ("Officer Robinson") was dispatched to investigate an attempted armed robbery, allegedly by a Hispanic man, that had recently occurred at an apartment building on Third Avenue in Maywood, Illinois ("the building"). When Officer Robinson arrived at the building, petitioner approached him, reported that someone had tried to rob his brother, Marlan Price ("Price" or "petitioner's brother"), and then described the alleged robber for Officer Robinson. Once petitioner was finished, Officer Robinson began speaking to petitioner's brother.

While Officer Robinson talked to Price, petitioner walked to an entrance of the building and frisked some men there. This prompted Officer Robinson to ask petitioner what he was doing. Petitioner responded by informing Officer Robinson that petitioner was an off-duty officer in the Chicago Police Department, displaying his identification card attesting thereto, and adding that the men in the entrance to the building were loitering. Petitioner was wearing plain clothes.

At trial there was a conflict between the testimony of Officer Robinson and petitioner with respect to whether Price then pointed to a man whom he claimed looked like the culprit. Officer Robinson testified that Price did not identify anyone as the probable robber, but petitioner testified that his brother identified a man named Fernando Casas ("Casas") as looking like the

---

[1] This recitation of the facts is drawn from the opinion of the Illinois Appellate Court, Hampton, 718 N.E.2d at 594-96. Petitioner agrees that this recitation of the facts is correct. See Abrams v. Barnett, 121 F.3d 1036, 1038 (7th Cir. 1997). For the sake of economy, some facts will be addressed in further detail in the discussion section below.

culprit. At any rate, there does not seem to be any dispute that Officer Robinson then expressed concern to petitioner that frisking five people by himself was dangerous. Thereafter, petitioner and Price left the vicinity of the building. Importantly, Officer Robinson never doubted that petitioner was a Chicago police officer.

Another Maywood officer, Officer Jesse Ingram ("Officer Ingram"), arrived thereafter. Along with Officer Robinson, Officer Ingram questioned the men petitioner had frisked earlier. Casas fit the initial description given to police but, apparently because he was known to the police officers, he was released. The remaining men, including a man named Stanley Polk ("Polk"), were unable to produce satisfactory identification and agreed to go to the police station.

Prior to leaving for the station, Polk produced a Chicago police badge (later determined to belong to petitioner) to Officer Ingram and informed him that petitioner had dropped it. Officer Ingram was then asked (apparently by another officer) to secure the front door of an apartment inside the building that he had left open. Officer Ingram complied, entering through the rear of the building.

At some point between petitioner leaving the vicinity of the building and Officer Ingram emerging from the building, another Maywood police officer named Aaron Wade ("Officer Wade") arrived at the building and saw a brown Cadillac leaving the area. Then, while Officer Ingram was still in the building, a Cadillac, which possibly was brown, was seen by Officers Robinson and Wade parking on the street a little north of the building.

At this point, only a few minutes had passed since petitioner had left the scene. The Cadillac was not seen committing any traffic violations, but Officer Wade observed that the car's

headlights were turned off. Officer Robinson was unable to see the occupants of the car when it first arrived.

Petitioner's brother exited the car from the passenger's side and walked toward the rear of the building. Despite recognizing petitioner's brother as the victim of the alleged robbery, Officer Robinson radioed to Officer Ingram that someone was coming up the back and that someone else remained in the car. Officer Ingram emerged from the building, saw that the car's windows were tinted, and, supposedly for the safety of the police officers, decided to draw his gun and order petitioner's brother to lie down on the sidewalk. Price apparently complied.

At this point, because Officer Ingram wanted to see who remained in the car, Officers Robinson, Wade and eventually Ingram went over to the car. As Officer Robinson approached the car, he saw that the driver was petitioner. Officer Robinson positioned himself on the driver's side of the Cadillac. Petitioner testified that at this point Officer Ingram walked up to the Cadlillac and petitioner identified himself as a Chicago police officer. Officer Ingram, who was standing at the passenger's side, then told petitioner to exit the car.[2] Petitioner complied. Petitioner said, "It's me," though there was conflicting evidence as to whether he said this before or after he exited the car.

According to Officers Wade and Ingram, petitioner did not immediately step out of the car. Officer Ingram testified that petitioner responded to the request (to step out of the car) by rolling down the window partially and saying, "It's me," to which Officer Ingram responded by

---

[2] Although the Hampton court describes Officer Ingram's utterance as a request in its recitation of the facts, the court's later finding that petitioner was "temporarily seized," along with its description of how the officers "immediately required [petitioner] to exit the car," and its conclusion that "ordering [petitioner] out of the car was not an unreasonable action," indicate that petitioner was instructed to exit the car. Compare 718 N.E.2d at 595 and id. at 600.

4

again asking petitioner to step out of the car. Officer Ingram testified further that after petitioner exited the car, Officer Robinson identified petitioner as the police officer that Officer Robinson had spoken about earlier.

At the state trial, there was conflicting evidence about exactly what happened next. It is clear that petitioner was asked whether he had a weapon, but there was conflicting evidence as to whether that question was asked before or after petitioner was asked to exit the car. At any rate, petitioner answered that he did have a weapon and that it was on the front seat. Officer Robinson testified that upon hearing that and after petitioner exited the car, Officer Wade, who was also standing next to the driver's side, entered the Cadillac through the passenger's side to retrieve the weapon. Officer Ingram testified that, after Officer Wade entered the car, he stood back up and said, "There's drugs in here."

Officer Wade testified that petitioner had left the car door open and that, as Officer Wade stood outside the driver's door, he shined a flashlight into the car and was able to see a brown plastic bag containing four bags, each bag being a little larger than a sandwich bag. Petitioner testified that it was not until after Officer Wade had entered the car and had opened the bag that Officer Wade said that the contents looked like cocaine.

After the officers found the cocaine, petitioner was handcuffed, arrested, and charged with the crimes outlined above. Prior to trial petitioner filed a motion to suppress the cocaine from evidence. The trial court denied the motion, finding that the stop of petitioner was justified by the fact that the "police were investigating a violent crime, that [petitioner] was out of his jurisdiction, and that the police had a right to be concerned as they approached the car because of

5

[petitioner's] weapon," as recounted by the Illinois Appellate Court. Hampton at 596.³ With the cocaine in evidence, petitioner was convicted of all four counts.

Petitioner appealed the trial court's ruling on his motion to suppress, and the Illinois Appellate Court affirmed, concluding that petitioner was indeed temporarily seized but finding that seizure justified under the circumstances. Id. at 597-600. The Hampton court explained:

> An armed robbery had recently taken place apparently in the vicinity of the apartment building; that crime involved danger of serious injury. The Maywood police officers knew that [petitioner] had knowledge of the crime and could aid in the investigation of the crime. Although the Maywood police officers knew [petitioner's] identity and could have attempted to reach him later by contacting the Chicago police department, the exigency of the recent alleged crime did not require them to wait and delay further investigation. . . . We acknowledge that the police officers never commenced an interrogation of [petitioner] about the attempted robbery: because they immediately required [petitioner] to exit the car and because the cocaine was visible to the police, they discovered the cocaine upon [petitioner's] exiting the car. We believe that ordering [petitioner] out of the car was not an unreasonable action; the car was already stopped, and having [petitioner] exit in order to speak with him would not have unduly lengthened a brief detention of a possible witness.
>
> Id. at 599.

---

³ The instant opinion is focused on the Illinois Appellate Court's decision in Hampton, which upheld the trial court's ruling on petitioner's motion to suppress. Even so, the court notes that the trial court's ruling is not based on constitutional precedent and relies on facts which are irrelevant to the constitutional inquiry at hand. In determining whether the seizure of petitioner was unreasonable under the Fourth Amendment it does not matter that petitioner, an off-duty police officer, was out of his jurisdiction; off-duty police officers are free to travel outside their jurisdictions and no inference of wrongdoing can be drawn from the fact that petitioner did so. The court also notes that, based on the findings of fact by the Hampton court, the trial court's conclusion that the police had a right to be concerned about petitioner's gun as they approached the car in which he was sitting, is doubtful; The Hampton court found that the officers "initially could not have approached the car with the intention of speaking with [petitioner] further about the reported crime because they did not know [petitioner] was driving the car." Hampton at 596.

6

## APPLICABLE HABEAS CORPUS STANDARDS

When a habeas corpus petitioner claims his Fourth Amendment[4] right to be free from unreasonable searches and seizures has been violated, this court can take action only if the petitioner has not been given an "opportunity for full and fair litigation" of his claims. Stone, 428 U.S. 465 (1976). According to the Seventh Circuit, a petitioner has been provided such an opportunity when:

> (1) he has clearly informed the state court of the factual basis for that claim and has argued that those facts constitute a violation of his fourth amendment rights and (2) the state court has carefully and thoroughly analyzed the facts and (3) applied the proper constitutional case law to the facts.

Weber v. Murphy, 15 F.3d 691, 694 (7th Cir. 1994), cert. denied, 511 U.S. 1097 (internal quotations and citations omitted).

Similarly, the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. §2254(d) (the "AEDPA"), bars habeas claims unless the previous state court proceedings: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Under the former "unreasonable application" clause, a

---

[4] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers and effects, and against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

7

federal habeas court may grant the writ "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000).

**DISCUSSION**

Petitioner's strongest argument is that the Illinois Appellate Court failed to apply the proper constitutional case law, and unreasonably applied principles set forth by the Supreme Court to the facts of the instant case. See Stone, 428 U.S. 465; Williams, 120 S.Ct. 1495, 1523. The court agrees. Upon close examination, the court concludes that the cases, statute and treatise cited by the Hampton court in reaching its decision do not support that ruling. Moreover, constitutional precedent that was omitted by the Hampton court directly contradicts its holding. Thus, the court grants petitioner's application for a writ of habeas corpus.

The court begins where the Hampton court began: with the Supreme Court precedent applicable to the instant case. The Hampton cited Terry v. Ohio, 392 U.S. 1 (1968), for the proposition that, "where a police officer observed defendant's suspicious behavior and suspected that defendant was about to commit a crime, the Court upheld the police officer's protective pat-down search, although the police officer lacked probable cause for arrest." Id. at 598. True, but the Hampton court's own findings led it to conclude that petitioner "was not a suspect in any crime but rather was a person who reported a crime committed against another." Id. at 598. Further, none of the officers testified that petitioner was behaving suspiciously, nor did they testify that they wished to question petitioner. See id. Thus, Terry does not support the officers' seizure of petitioner in the instant case.[5]

---

[5] The Hampton court's own recognition of this is seen in its conclusion that the Terry Court "expressly declined to decide whether an investigative seizure upon less than probable cause would be proper." Hampton at 598 (citing Terry, 392 U.S. at 20 n.16).

8

The Hampton court also cited Terry for the proposition that, "Where the officer making a Terry stop reasonably believes, based on specific, articulable facts, that his safety or the safety of others is in danger, the officer may also conduct a limited search of an individual for weapons." Also true, but the Hampton court did not find that the police officers actually feared for their safety or for the safety of others, much less that such fear was based on specific, articulable facts. See 718 N.E.2d at 599-600. Instead, the Hampton court speculated that, "Although there was no evidence that [petitioner] had committed a crime, the police officers knew that [petitioner] was a Chicago police officer and therefore could be armed, and they may have feared for their safety because of the odd circumstances in which one of the detained persons had been in possession of [petitioner's] police badge." Id. at 600. This conjecture on the part of the court cannot replace the Terry Court's requirement that the officers involved in the stop have fear for their safety or for the safety of others and base that fear on specific, articulable facts. See Terry, 392 U.S. at 27[6]. Thus, Terry also does not support the officers' search of petitioner's car in the instant case.

---

[6] If the officers had testified to fearing for their safety for these reasons, the Hampton court would have had to determine whether a "reasonably prudent man in the circumstances" would fall prey to such fear. Terry, 392 U.S. at 27 (citations omitted). In deciding this issue, courts give weight "not to [the officers'] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which [they were] entitled to draw from the facts in light of [their] experience. Id. (citation omitted). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)).

The facts in the instant case indicate that the officers knew petitioner was a police officer and that, after petitioner had reported a crime at the building and frisked some men there, a detained individual produced petitioner's badge and explained that petitioner had dropped it. The facts further indicate that petitioner drove a car back to the building where he had misplaced his badge and that his brother exited the vehicle and walked toward the building. It is difficult to imagine that any court could find, based on these facts, that a reasonably prudent man would fear for his safety or the safety of others under these circumstances.

9

The Hampton court next explained that the Supreme Court has "permitted the investigative detention of suspects in a car" so long as the police had a "reasonable suspicion of illegal activity," and the stop was "for the purpose of questioning the car's occupants." Id. (citing United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975)). In addition, the Hampton court described, the Supreme Court has permitted a Terry stop "of a person who was suspected of a felony that had already been completed." Hampton at 598 (citing United States v. Hensley, 469 U.S. 221, 228-29 (1985)). These are accurate descriptions of Supreme Court holdings but, like the Hampton court's citation to Terry, neither of these citations support the Hampton court's holding in the instant case.[7] Brignoni-Ponce, and Hensley are inapplicable here because petitioner was a "possible witness" and the police did not suspect him of being involved in any criminal activity. Hampton, 718 N.E.2d at 598. Further, none of the officers testified that, in

---

[7] The reasoning in Hensley directly contradicts the Hampton court's reasoning. The Hampton court found that, "Although the Maywood police officers knew [petitioner's] identity and could have attempted to reach him later by contacting the Chicago police department, the exigency of the recent alleged crime did not require them to wait and delay further investigation." Id. at 599. In Hensley the Supreme Court noted that the interest of crime prevention is not promoted as much, the exigent circumstances are not as pressing, public safety is less threatened, and the officers making stops "have a wider range of opportunity to choose the time and circumstances of the stop," when it comes to investigating past (versus future) crimes. 469 U.S. at 228-29 (citations omitted). "Despite these differences," in Hensley the Court held that, "where police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bri[n]ging offenders to justice." Id. at 229. Of course, the particular circumstances present in Hensley are not present in the instant case; the police did not try to locate petitioner before recognizing him as the individual inside the brown Cadillac. In fact, as explained above, the Illinois Appellate Court itself pointed out that none of the officers testified that they wished to question petitioner when they seized him and, importantly, no such interrogation ever took place. Id. at 598-99. Given these facts, and given the Supreme Court's recognition that the rationale sustaining the holding in Terry is diluted when it comes to investigating past crimes, the Hampton court's finding that "the exigency of the recent alleged crime did not require them to wait and delay further investigation" carries no constitutional weight.

10

seizing petitioner, they wished to question him about the crime they were investigating. Id. at 598.

Terry, Brignoni-Ponce, and Hensley are the only United States Supreme Court cases cited by the court in Hampton. Interestingly, the Hampton court left Brown v. Texas, 443 U.S. 47 (1979), out of its discussion of applicable Supreme Court precedent. In Brown, the Court reaffirmed the principles of Terry, and noted that although "some circumstances" may allow an officer to "detain a suspect briefly for questioning" without "having 'probable cause' to believe that the suspect is involved in criminal activity, as is required for a traditional arrest," the Supreme Court has "required the officers to have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." 443 U.S. at 51 (citations omitted).

Indeed, the Court in Brown found that the "flaw in the State's case," was that "none of the circumstances preceding the officers' detention of [the] appellant justified a reasonable suspicion that he was involved in criminal conduct." Id. at 51-52. Although one officer testified that the appellant "looked suspicious," and it was true that the appellant was "in a neighborhood frequented by drug users," the Court held those factors insufficient bases for finding that the "appellant himself was engaged in criminal conduct." Id. at 52. Thus, the Court concluded that, "In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference."

As was the case in Brown, the officers in the instant case did not have a reasonable suspicion, based on objective facts, that petitioner was about to be (or had already been, under Hensley, 469 U.S. 221) involved in criminal activity. See Brown 443 U.S. at 51. As explained above, the Hampton court concluded that petitioner "was not a suspect in any crime but rather

11

was a person who reported a crime committed against another," and there is no indication that petitioner's behavior was at all suspicious. See Hampton at 598. Thus, had the Hampton court followed Brown, it simply could not have reached the conclusion it did. See also, Wardlow, 528 U.S. at 123-26 (reiterating that, "In Terry, we held that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot," and explaining that the Court granted certiorari "solely on the question of whether the initial stop was supported by reasonable suspicion").

Perhaps mindful that the weight of Supreme Court precedent did not support its holding, the Hampton court next turned to an Illinois statute. The court in Hampton asserted that, "Under [an] Illinois statute, a police officer is authorized to temporarily question suspects, including a person who is suspected of an offense that has been completed." Id. at 598. In reaching this conclusion, the Hampton court relied on 725 ILCS 5/107-14 (West 1994), which provides:

> A peace officer . . . may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense . . . and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped.

Although the Hampton court is correct that this statute authorizes police officers to question individuals who are suspected of having participated in a past offense, this statute is no more helpful to its holding than the cases cited above. 725 ILCS 5/107-14 authorizes a seizure when "the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense." As explained above, the Illinois Appellate Court concluded that petitioner "was not a suspect in any crime but rather was a person who reported a crime committed against another." Hampton at 598. Thus, the Illinois statute is inapplicable.

12

Next, the Hampton court relied on People v. Long, 457 N.E.2d 1252 (Ill. 1983), to conclude that, "Illinois recognizes that under Terry there is a limited exception to the probable cause requirement permitting a police officer to briefly detain a person for investigatory purposes and, if necessary for safety, to search that person for weapons." Hampton at 598. This is a clear misinterpretation of Long. In Long, the Illinois Supreme Court held that "the requirements of Terry were met in this case" because "the governmental interest in questioning suspects near the scene of a recently committed crime outweighs the intrusion on defendant's fourth amendment interests." 457 N.E.2d at 1258. Conversely, the requirements of Terry are not met in the instant case because, once again, here petitioner was a "possible witness" and "not a suspect in any crime." Hampton at 598.

Apparently in reaction to the lack of Supreme Court or even Illinois law supporting its holding in the instant case,[8] the Hampton court next relied on a search and seizure treatise for the proposition that, "the power to stop should be extended to potential witnesses, although in more narrowly circumscribed circumstances than the stopping of suspects." Id. at 598 (citing 4 W. LaFave, Search & Seizure § 9.2(b), at 24 (3d ed. 1996)).

But again the Hampton court misinterprets its source. In his treatise, LaFave advocates allowing police to stop witnesses under circumstances that, even if generally accepted, still would not apply to the instant case. LaFave discusses the "sensible position" taken by the Model Code of Pre-Arraignment Procedure (a proposed statute that was never adopted in Illinois), which "meets a genuine need because it provides a lawful basis whereby 'an officer coming upon

---

[8] The Hampton court's misapplication of Supreme Court constitutional precedent, discussed above, alone requires granting of the writ pursuant to 28 U.S.C. §2254(d). The following discussion, addressing the Hampton court's other reasons for affirming petitioner's conviction, is included only for purposes of completeness.

13

the scene of a recently committed crime can 'freeze' the situation and obtain identifications and an account of the circumstances from the persons present.'" 4 W. LaFave, Search & Seizure § 9.2(b), at 24 (3d ed. 1996) (quoting the Model Code of Pre-Arraignment Procedure 9-10 (1975)). The provision of the Model Code proposes that officers be allowed to make a stop whenever:

> (i) The officer has reasonable cause to believe that a misdemeanor or felony, involving danger of forcible injury to persons or of appropriation of or danger to property, has just been committed near the place where he finds such person, and
>
> (ii) the officer has reasonable cause to believe that such person has knowledge of material aid in the investigation of such crime, and
>
> (iii) such action is reasonably necessary to obtain or verify the identification of such person, or to obtain an account of such crime.
>
> Model Code of Pre-Arraignment Procedure § 110.2(1)(b) (1975).

As explained in Hampton, the officers "initially could not have approached the car with the intention of speaking with [petitioner] further about the reported crime because they did not know [petitioner] was driving the car." Hampton, 718 N.E.2d at 599. Thus, applying the Model Code's proposed test, at the time they approached the car and told petitioner to get out, the officers' seizure was inappropriate because they did not have reasonable cause to believe that the man in the car had knowledge that could aid the investigation of the alleged crime.[9] Further, at whatever moment one or all of the officers recognized petitioner as the Chicago police officer who reported the crime earlier, their seizure of petitioner was inappropriate because it was not

---

[9] The Hampton court's notation that the car petitioner was sitting in was "a Cadillac, which possibly was brown," and its earlier mention that Officer Wade saw a "brown Cadillac leaving the area" when he arrived, cannot overcome this deficiency. Id. at 595. It was Officer Ingram, not Officer Wade, who wanted to see who remained in the car, and there is no indication that Officer Wade told Officer Ingram that he had seen a similar car leaving the area when he arrived. See id.

14

reasonably necessary to obtain or verify his identity or to obtain an account of the crime.[10] Thus, regardless of exactly when the officers knew it was petitioner in the car, LaFave's favored Model Code test would not provide a lawful basis for petitioner's seizure in the instant case because the second and the third elements cannot be met as required. This conclusion is bolstered by the fact that the rationale behind the Model Code provision—allowing police to "freeze" a crime scene to learn the identity of those present and to hear their accounts of what happened—would not be served by applying it in the instant case. See 4 W. LaFave, Search & Seizure § 9.2(b), at 24 (quoting the Model Code of Pre-Arraignment Procedure 9-10 (1975)). The officers obtained petitioner's contact information and his account of the circumstances of the alleged robbery before they seized him. Therefore, the Hampton court's reliance on the Model Code test was misplaced.

Finally, the Hampton court cited three cases also cited by LaFave: Baxter v. Arkansas, 626 S.W.2d 935, 937 (1982), Williamson v. United States, 607 A.2d 471, 476-78 (D.C. App. 1992), and State v. Shaffer, 574 P.2d 205, 208 (Kan. 1977). The first two cases allow for investigative stops of potential witnesses whose identities are unknown when exigent circumstances are present (which is approximately what the Model Code test would allow). See Baxter, 626 S.W.2d at 937; Williamson, 607 A.2d at 476-78. The third case, Shaffer, concludes that a gun seen in plain view by an officer was properly admitted where the officer pulled the car over in order to question the driver, who was known to be a potential witness to a murder.[11] 574

---

[10] The Hampton court's findings of fact support this conclusion. The "police officers knew [petitioner's] identity and could have attempted to reach him later by contacting the Chicago police department," and anyway the officers had already spoken to petitioner about the alleged crime. Hampton at 599.

[11] The Shaffer court reasoned that the stop was proper because, "It was proper police procedure to question former employees under the circumstances. The police had a right to do

15

P.2d 205, 208. To the extent these cases allow police officers to seize individuals about whom the officers do not have a reasonable suspicion, based on objective facts, that the individual was involved in criminal activity, these cases conflict with Supreme Court precedent and must be disregarded.

This leads this court to another case which, like the Supreme Court's decision in Brown, the Hampton court chose not to address. In this instance, however, the Hampton court's failure is particularly curious because the case at issue, the *en banc* decision of the Ninth Circuit in United States v. Ward, 488 F.2d 1623 (9th Cir. 1973), is discussed at length by LaFave in his treatise.[12] In Ward, just as in the instant case, the law enforcement stop in question did not come about due to an "emergency situation nor any need for immediate action." Id. at 169 (noting specifically that, as in the instant case, the "agents never sought an interview with the appellant at either his home or place of business although both could have been arranged"). Most importantly, the Ward court emphasized that, like the officers' stop of petitioner in the instant case, the stop in that case "was not made pursuant to the agent's founded suspicion that the detainee was involved or about to be involved in criminal activity." Id. Instead, the stop in Ward was made "for the purpose of questioning the appellant about a third person," which was found to be outside the reach of Terry. Id at 169-70 (concluding that "the narrow exception of Terry v. Ohio, *supra*,

---

so. . . . The vehicle was lawfully stopped and the officer viewing the gun had a right to be where he was." Id. The Shaffer court supported its final conclusion that "admission of the gun is held to be proper" by citing to three Kansas Supreme Court cases, none of which address the "precise question" the Shaffer court addressed, but all of which are supposedly "consistent" with that opinion. See id. Not one United States Supreme Court case is cited by Shaffer in reaching its decision on this issue.

[12] The Hampton court could not miss LaFave's discussion of Ward; the Baxter, Williamson, and Shaffer cases discussed above are cited in footnotes within LaFave's discussion of Ward. See 4 W. LaFave, Search & Seizure § 9.2(b), at 25 n.28 and n.30 (3d ed. 1996).

16

which allows investigative stops on grounds short of probable cause[,] cannot be stretched so far as to allow detentive stops for generalized criminal inquiries").

The Ward court explained: "In conformity with Terry, we have repeatedly held that a founded suspicion that criminal activity is afoot is a minimum requirement for any lawful detentive stop." Id. at 169. This court agrees with Ninth Circuit; Terry requires officers to have a founded suspicion that criminal activity is afoot before they can seize individuals and, in the instant case, no such suspicion existed in the minds of the officers. See also Hicks v. Marsalek, 1999 U.S. Dist. LEXIS 3562 (N.D. Ill. March 23, 1999) (addressing many of the authorities followed by the court in Hampton and refusing to find that the seizure of the plaintiff was justified on the grounds that she was a potential witness where the police lacked reasonable suspicion to believe that the plaintiff was involved in criminal activity).

Based on all of the above, the deficiencies in the Hampton court's decision are clear. In upholding the trial court's ruling, the Hampton court failed to apply the proper constitutional case law, and unreasonably applied the principles set forth by the Supreme Court to the facts of the instant case. See Stone, 428 U.S. 465; Williams, 120 S.Ct. 1495, 1523.

When the Supreme Court decided Terry, it created an exception to the Fourth Amendment requirement that police officers procure a warrant, supported by probable cause, prior to conducing a search or seizure. The Hampton court's decision expands that exception beyond the bounds set by the Supreme Court in Terry and its progeny. Hampton holds that police officers can lawfully seize a potential witness to a crime, even where the police have no intention of questioning the individual and where they do not suspect him of being involved in illegal activity. Hampton also holds that courts can uphold a search performed by a police officer as long as the court, rather than the individual conducting the search, can identify specific facts

17

which may have caused the officer to fear for his or her own safety or for the safety of others. There is no Supreme Court precedent supporting these holdings. In fact, the Hampton court's holdings are in direct contravention with Supreme Court precedent.

For these reasons, the court finds that petitioner was not given an "opportunity for full and fair litigation" of his claims under Stone, 428 U.S. 465, and that the Hampton court's ruling upholding the denial of petitioner's motion to suppress the cocaine from evidence in his trial "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," under the AEDPA. Under these circumstances, the court grants petitioner's application for writ of habeas corpus.

## CONCLUSION

For the reasons set forth above, the court grants petitioner's application for writ of habeas corpus and directs that petitioner be released from custody unless the State of Illinois retries petitioner, consistent with the constitutional standards discussed above, within 90 days of this decision.

**ENTER:** **January 29, 2002**

**Robert W. Gettleman**
**United States District Judge**